Good morning, ladies and gentlemen. We only have one case for this early morning session. Case of Salari v. INS. Counsel? Good morning, Your Honor. Brian Lerner on behalf of Appellant. I'd like to start off by making a few responses to the respondent supplemental brief that was filed. Firstly, they claim in the first paragraph that there have been no law changes since 1994, so therefore there will be no supplemental sites and so forth. But, in fact, that's not true. The Convention Against Torture, of which the United States is a treaty, came into effect in 1998, and the Convention Against Torture prevents somebody from being returned to their home country if they show it's more likely than not that they will be tortured upon return. Judge, don't you have to make a claim under the Convention Against Torture? The current state of the law is that when the asylum application is filed, the Convention Against Torture is automatically considered. So that's a major change from pre-1998. But was the Convention Against Torture before or after the BIA decision? It was after, Your Honor. It was after. When does the BIA get to consider that? At this point here, the BIA could not consider it because the United States was not a treaty to the international sign-on of the Convention Against Torture. I'm only making Your Honors aware that, in fact, there has been a significant change in the law since 1994, since the Convention Against Torture is now a part of normal asylum applications. Well, it's nice of you to make us aware, but the question is, what effect does that have on this proceeding, in your opinion? It enhances the fact that if an appellant gets returned to his home country, that it is more likely than not, based upon the evidence that is before this Court, that he will be tortured and killed pursuant to his testimony. Well, since you mentioned that, just assume that we get to the point that if either that you say that the credibility found that you attack the credibility finding, the adverse credibility finding, and you find that there was past persecution, what is there in the record that we have before us about future persecution? And why shouldn't, even if we get to that point, why shouldn't that go back for determination? Well, Your Honor, there is the documents that were submitted by a respondent at the hearing, which were given very little weight, one showing that he had to go back for basically what he testified, that he was going to be persecuted because he was in the NNU. That was the reason he went back to hiding basically for six months while his father obtained the necessary papers. So the evidence is in the record. There was no evidence to contradict that or to impeach that. Well, what about the fact that we're at such a different place now? That's why I'm here, that the last judge died. This case has been going on so long. In fact, I told my panel I'm a little nervous that I had to step into that position. I understand, Your Honor. I mean, one of the reasons obviously this case has been put over for so long is because there was various motions to reopen that have been made. The oral argument on this was stayed until the outcome of those motions. They've been denied, and here we are. Well, we can look at it two ways. We certainly don't want Judge Callahan to die on the job. The other thing is we might think it's finally time to bring this case to an end one way or another after all this time. Yes, Your Honor. This particular case, if it goes back, then the evidence that was submitted can be heard, and the proper weight of that evidence can be given. There was in the record multiple. It would be relevant, though, since so much time has passed, that, I mean, future persecution is different now than it was at that time. I mean, a lot can change in a country. I agree, Your Honor. And, in fact, the situation is worse now than it was back then. Iran is now part of the axis of evil. That's correct. And there was. It wasn't when this case first came up. It was just an ordinary country. That's correct. And the state reports back in the years that this case was heard were fraught with various types of persecution that was going on, especially religious persecution. In 2004, the religion. I think we could accept that there is religious persecution in Iran. The question, it seemed to me, that the case turns on is whether the organization, if it is an organization to which your client adhered, is one that would be viewed as religiously dissident for a Muslim. Thank you. The NUU essentially has a couple major beliefs. One, they believe in a God. And, two, they believe that Muhammad was not the last prophet. There is a religious sect in Iran, the Baha'i, which is all over the State Department reports. Right. That is true. Now, where did the testimony – was there testimony to the two points you just made? There was testimony, Your Honor, to those two points. From the – Yes, in the record. Of those two points, that there is a God and that Muhammad wasn't the last prophet. And the Baha'i – there's been rulings and death penalties in Iran because the Baha'i believe in a God and because they believe Muhammad was not the last source. And so just because NUU is not as big as Baha'i, essentially speaking, the beliefs are relatively the same. So if there's documented evidence that Baha'i is being persecuted, killed, tortured, and imprisoned, then that same theory goes over to the NNU. Just because there's smaller amounts of members, the beliefs are relatively the same. And that appears from the International Freedom Report and other reports from the Department of State. It is the beliefs that cause the religious persecution, not just the name of the – Okay, that's all out there somewhere. What about this record? We're stuck with this record. I understand, Your Honor. And this record – And so you're confusing me. Okay, I'm sorry. You're talking about – well, you're not confusing me. You're talking about a lot of things that aren't in the record, right? Okay, I'm talking – your question to me previously, Your Honor, was wasn't there a lot of changes between now and back when this hearing was held? All right. But to find the future – obviously, if you get – if the past persecution is there, then there's a rebuttable presumption, correct? Correct. All right. But then we're stuck with this record, and you're asking us to make a finding on this record that it's not rebutted. Your Honor, what I'm asking Your Honors to do is to look at the record. The record is clear. It shows that there was persecution. There was testimony from appellant that if he goes back to Iran, he will be tortured and killed. There was testimony to that. There was nothing to impeach that. The only thing that occurred is the immigration judge and the BIA, for the various reasons that are in the record, did not believe him. But there was no testimony put on the other side. There was no – Well, it just seems to me that part of the record wasn't really very well developed. Some of the record, Your Honor – actually, some of the transcript has not understood, not understood in multiple places in the transcript. So that might have led to some confusion as to what might have been said or not said. But it was clear that he did say that if he goes back to Iran, he will be tortured and killed. And there was testimony on the documentary evidence that was submitted, and the weight that that evidence was given we believe was incorrect. But because it was resolved in a different way, that issue really – it didn't really get to that issue, did it? Well, the way it was resolved, Your Honor, is the BIA and the immigration judge didn't believe him. Didn't believe him. Okay. So they didn't believe the past persecution. That's correct. They did not believe him. Right. So you never get to the hopeful analysis, that being the case. That would be correct. But the basis upon which they didn't believe him is why we're here today. Right. Okay. And that the record shows that there was past persecution and that there would be future persecution. And, Your Honors, I'd like to reserve the rest of my time for rebuttal. May it please the Court. Nora Askilish-Forrest, Correspondent, John Ashcroft. Good morning, Your Honors. There are two problems with this case. First of all, a lot of time has passed. But Petitioner is not shy of asking the Board to revisit his case. He's had five, no fewer than five bites at the apple. And – Well, he's up in the Court of Appeals to review the BIA decision. And we're getting to the merits finally now. I agree, Your Honor. So I don't know how many bites and how many apples he had, but we're in a legal proceeding where we're now in the Court of Appeals where we review the BIA decision. Absolutely, Your Honor. But what I would like to point out is Mr. Lerner's error that CAT is not an automatic application. Withholding is automatic with an asylum application. CAT is an affirmative application which must be made by the applicant. Now, because he was in proceedings when CAT was made part of our laws, he had until I believe it was April 1st, 1997, to move to reopen, to apply for CAT protection. He did not. Therefore, it is waived. CAT is not an issue in this case. He had the opportunity. And as I said, and as it's in the record before this Court, he has moved to reopen for suspension. He has moved to reopen for – to apply for adjustment of status. Both of those were denied. The Court specifically gave him time to petition for review. He did not follow that Court's order. Moreover, it was not Mr. Lerner, but it was another attorney before who failed to advise the Court that the motion to reopen was denied in October of 2001. This Court in December of 2001 said, okay, well, let us know when the case is decided, and if you wish to petition for review, we'll consolidate the cases. At that time, he knew that there had been a denial, and yet he waited another almost three years for this Court to say, hey, what's going on? So it's an old record, but the reason it's an old record is for the benefit of petitioner. This is not on the part of the government. We haven't sat on a stale record. And that's the procedural part. So he did not apply for CAT. CAT is not an issue. It has been waived. He cannot apply for it now. But on the legal issue, we have here, he was in his basic claim is NUU is apostasy. People are killed if they are apostates. However, he was briefly a member of NUU. He converted back to Islam in 1982, not because he was afraid of being persecuted, but to please his father. In his asylum application, he listed his religion as Islam. Therefore, when he lived in Iran, he was under arrest in Iran. He said he was known to be a member of NUU, and he was not killed, even though he says that that membership would lead him to death, any apostate to death. He was not killed in 1982 when he was not in custody. I don't understand that argument. If we only had cases from people who had been killed, we wouldn't have much business. What we have are cases from people who are afraid they're going to be killed and that there's a chance they will. They only need a 10% chance. Now, if they were lucky enough to be in the 90% chance and got here, that doesn't mean because they weren't killed that they don't have a case. But, Your Honor, when he, in 1982, when he was in custody, and he said he was taken with a class of NUU members, and he was in custody for 30 days, and they asked him about NUU, he was not tortured. He was treated like any other prisoner. He was beaten. He was assaulted. Well, his description is a lot. In his brief, he says beaten. In his testimony, he says he was slapped, but he wasn't treated any differently than other prisoners. And he was – then we get to the mixed motive issue, which is he hasn't established that it was on account of NUU membership. He has established that it was pursuant to an investigation. And, in fact, his teacher stayed in jail for a lot longer. He was released, and he also was questioned about why he hadn't served his military duty. And he was released and went into the military. Well, I guess the question that I have in terms of – those were some of the prongs of why the IJ found adverse credibility, correct? I mean, there were a few things in terms of that the – that they found it somewhat illogical that he would have then gone to the military. And, you know, I'm wondering what speculation and what's based on the evidence. Well, okay, first of all, we don't go to the immigration judge's decision. You must have been as shocked as I reviewing the record and seeing a seven-page board decision and a State Department opinion based on this person. We don't see those anymore. But the Board of Immigration Appeals did not find adverse credibility. They found gaps in the evidence. So we assume, then, he was credible. Yes, absolutely, Your Honor. Because I think the appellant's arguing otherwise about saying – The immigration judge found, but we're not reviewing the immigration judge's decision. Right, but I think the appellant is saying that what the BIA did was tantamount to adverse credibility. Isn't the appellant arguing that, though? Did I have that wrong? It's wrong. Well, I know, but I'm just trying to – you know, I'm trying to focus what the appellant's saying relative. It's implicit in the board's decision. What the board said was, we don't find that he's met his burden of proof. There are evidentiary gaps. Those gaps are not for – petitioner can't speculate. This is a lie saccharized. The evidence must compel. What we are reviewing here is the board's determination that, A, there was no past persecution, and, B, there is no well-founded fear of future persecution. Absolutely, Your Honor. And the board has decided both those questions on the merits, assuming his testimony to be credible. Yes, Your Honor. Okay. But the evidence simply did not – What do you do with a statement in the BIA's opinion saying, we are not prepared to accept the respondent's testimony at face value? Or when they say, as the service pointed out in its brief, the respondent's testimony on this issue was not conducive with the truth? Well, again, what they also decided that what he had engaged in was he didn't know. There were a lot of I don't knows. The indiscernibles do not affect the outcome, and if you believe they did, that was a matter to raise on appeal to the board. That's waived. The point is, there are gaps in the evidence, and he speculates. This is what might have happened. This is what I think. And that's what the board was addressing. And the fact is, it was not consistent with the documentation. The State Department reports, the country reports, and the letter issued for this particular applicant. It was not consistent, not credible, but what he did was speculate. It's not for him to speculate. It's for him to establish the evidence which compels the conclusion he wants his court to reach. When there are gaps in the evidence, that's for the board to fill. And the board filled it. And it was entirely within its authority to do so. The weight of the evidence, this court cannot reweigh. But what happened here was he was in custody when he was a member of NUU NUU was being investigated, and he was released. He served in the military without any limitation for two years. And then he lived there for almost another year. Well, if I were to conclude that substantial evidence doesn't support the past persecution, is the record developed enough to make a determination of future persecution? Absolutely, Your Honor. And if it's not, it was his burden to develop it. And he's had several chances to do so or to challenge the fact that something was overlooked or ignored or he was deprived of the opportunity. He has not done so. But Appellant is saying that he has done that, but did the government have an opportunity to develop that? Because it seems that it was sort of nipped in the bud there. In what manner, Your Honor? Well, it just seems that all that he said was, I'm afraid of future persecution, but the government didn't do anything to rebut that. But we don't have to rebut a fear of persecution unless he's shown past persecution. In any event, you've done all you wanted to do. Is that right? Yes, and we believe that the record supports these. You believe it's enough? Absolutely, Your Honor, in this case. And, again, if he didn't feel it was enough, he had the opportunity to move to reopen for changed country conditions, to apply for protections. I see the government. So you're both satisfied with the record? Yes, Your Honor. Okay. That's fine. And, again, I really need to reiterate on the merits. When he was in custody, when he was with NUU in 1982. They didn't kill him the first time they had him, so he's home free. They also didn't torture him. And ran. Well, they didn't torture him on account of it. They questioned him about suspected terrorist political activities. His teacher remained in custody for a long time after that. Well, the board characterizes his testimony as if he was beaten. Well, the board said that, but he didn't say that. He said slapped. But he also said he was not treated any differently than other prisoners. And all the country reports say that prisoners are routinely tortured. He never claimed that he was tortured. See, if they persecute all their prisoners and they persecute him because of his religious beliefs, it's still persecution. Absolutely, Your Honor. But he hasn't been persecuted on account of his religious beliefs. The first time, it was one day, he was not mistreated. He was asked, why aren't you in the military? Military service is compulsory. They were at war. And young men were being forced to enlist or were being conscripted for twice the minimum compulsory, four years. So when he had no problems in the military, he served as a driver and as a guard. And then when he was released, nobody came after him. What's this? The letter that he was to be turned over to something, the court martial or the prosecutor? There were letters issued, but we don't know what the significance is. He doesn't know what the significance is. He thinks he says one is court martial and maybe it was because of this. But he's speculating. He does not know. There is nothing in the record to say this is what happens when one receives such a letter. He says maybe it's because of N.U.U., but there's nothing in there about N.U.U. So from 1981, when the government knew he was affiliated with N.U.U. and when he left in 1985, nobody ever went after him. And there's no reason to believe that anyone would go after him in 2005 when he's converted back to Islam. How long was the period from the time that he was released from the military until he left the country? I think it was over a year. He was released in 1984. He left in March of 84, and he left in September of 1985. So that's more than a year. And he went to his hometown, and he stayed there. And he got a passport, and there's no indication that anyone came looking for him. And, in fact, the second letter may have simply been a bench warrant. You didn't report as ordered. And we don't know what it is. That's the problem. But it's the board to speculate that there's no persecutory motive behind it when he has failed to establish that there was one in the first place. And if there are no more questions, the government submits. Thank you, Your Honors. Thank you, Counsel. I'd like to just respond to a few points here. On several occasions, counsel has said that Apollon was speculating. It wasn't speculation. It was testimony. There's never going to be a general in the courtroom saying, if he goes back to Iran, I'm going to shoot him dead. I mean, everything is what he would refer to as speculation. It's testimony as to what would happen. The question is, was it credible? Was it believable? And was there anything to impeach it? And we are claiming that there was not anything to impeach it and that it was credible. The letter that was brought. It's your position that the BIA did make an adverse credibility finding. They agreed with the judge, Your Honor. So, yes. Even if it's determined they didn't make that such finding, they ruled on why they believed that there was no political asylum, why the burden had not been met. And each of those burdens was based upon the BIA speculation. Now, it is not the part of the BIA to speculate. I mean, there was multiple incidences in country reports and country conditions that showed the persecution, yet they decided to just speculate with no evidence, no testimony, nothing in front of them as to why they believed what his testimony meant, whatever. When appellant in the underlying hearing says that that letter, which was translated, says that he is going to be persecuted and killed because of his affiliation with NUU, that was the testimony. It's not speculation. That was his testimony. There was nothing to rebut it. The military. The reason he was in the military was because his uncle had pulled some strings so that he wouldn't be killed or tortured. So he gave the illusion that he was part of Islam again. And, of course, he didn't go in the military and say, I'm an NUU member. I believe in God. I mean, everybody wants to live. Testimony that his uncle came and got him out of jail and took him to the military, right? The testimony was his uncle pulled some strings and got him into the military basically to save him. But was it from jail to directly to the military? Basically, yes. Yes. And then once he left the military, again, he didn't go parading about the streets that he's an NUU member. He went into hiding for about a year before his father could pull some strings to get him out of the country so he could come to the U.S. Well, the letter to report to the prosecutor, where was that? What was that in the time relative to his getting out of the military? That was immediately upon his release from the military. It was, okay, you served your time now. You did your service. Now you're going to go to the prosecutor. Okay? Now that's the document that he translated himself. That's correct. That's correct. And the record said that they weren't giving it much weight because he translated it. Correct. But then the record didn't, the judge, they have Iranian Farsi interpreters. They could have easily brought one in, put him under oath and said, does this say what it purports to say? And that was never done. Okay? So in closing, we have an appellant here who, if he is returned to Iran, he will be tortured and killed and at the minimum put in prison. And we are asking that this court grant the asylum. If it is brought back to the immigration judge, he also qualifies for adjustment of status based upon marriage to a U.S. citizen. And based upon all of the foregoing, we would respectfully request that asylum be granted in this case. Thank you. Before we submit this case, counsel, I wanted to mention to you particularly, we have had recently a settlement program in cases in which people were eligible for adjustment of status. It's not a mandatory program, but your agency has in a number of cases agreed that if someone was eligible, they would submit that to the mediation program. So would you just check with your office and let us know within 10 days whether that is something you'd be interested in in this case? Your Honor, I will just say probably not, because that denial was four years ago, and they haven't sought review. It's not an open issue now. Okay. It was because it was too late, was that it? I don't know, Your Honor. It's not part of the record. All we have is this motion in matters of base, which was what, 2007? I thought maybe because counsel said that now if it went back, it would be timely. Well, we don't know why it was denied. We were provided with a copy of the board decision, but the point is it was denied in 2001. All right. Well, just let us know in 10 days if by any chance this qualifies under whatever your office is doing these days. It's drawn on by this Court. Enter into mediation, happy to do it, because it brings closure. But I would submit that this case can be decided on this record. Well, you don't have to. If we don't hear from you, we'll know nothing's happening. I will write to you. Thank you. Your Honor, I'm sorry. The reason it was denied was totally because they said the numerical limitations of the motion was real, and it did not relate to the merits of the motion. Well, maybe they'll be happy to look at the merits now. Maybe not. But counsel, let us know when. Okay. Thank you. The case just argued will be submitted. Court will recess. Is it submitted before she answers the? It's unsubmitted, and we'll wait until we receive your letter, and then we'll submit it. Thank you, counsel. The case, the Court will stand in recess for the day.
judges: Canby, Reinhardt, Callahan